Slip Op. 08-30

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| ALLOY PIPING PRODUCTS, INC., *et al.,* | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | Before: Judith M. Barzilay, Judge |
| UNITED STATES, | : | Court No. 06-00454 |
| | : | |
| Defendant, | : | **PUBLIC VERSION** |
| | : | |
| and | : | |
| | : | |
| TA CHEN STAINLESS STEEL PIPE CO., LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |

## OPINION

[Motion for Judgment upon the Agency Record is denied.]

Dated: March 13, 2008

*Kelley Drye Collier Shannon*, (*Jeffrey S. Beckington*) and *David A. Hartquist* for Plaintiffs.

*Jeffrey S. Bucholtz*, Acting Assistant Attorney General; *Jeanne E. Davidson*, Director, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; (*Stephen C. Tosini*), Commercial Litigation Branch, Civil Division, U.S. Department of Justice; *Evangeline D. Keenan*, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for Defendant United States.

*Miller & Chevalier Chartered*, (*Peter J. Koenig*), *David T. Hardin, Jr.*, and *Elizabeth E. Puskar* for Defendant-Intervenor.

**BARZILAY, JUDGE:**  Plaintiffs Alloy Piping Products, Inc., Flowline Division of

Markovitz Enterprises, Inc., Gerlin, Inc., and Taylor Forge Stainless, Inc. (collectively,

"Plaintiffs"), domestic producers of stainless steel butt-weld pipe fittings, move for judgment

upon the agency record and challenge the final results of a periodic annual review for the period

of June 1, 2004 through May 31, 2005.  *See Notice of Final Results and Final Rescission in Part*

*of Antidumping Duty Administrative Review: Certain Stainless Steel Butt-Weld Pipe Fittings*

*From Taiwan*, 71 Fed. Reg. 67,098 (Dep't Commerce Nov. 20, 2006) ("*Final Results*"); *see also*

*Certain Stainless Steel Butt-Weld Pipe Fittings from Taiwan*: *Preliminary Results of*

*Antidumping Duty Administrative Review and Notice of Intent to Rescind in Part*, 71 Fed. Reg.

39,663 (Dep't Commerce July 13, 2006) ("*Preliminary Results*").  Foreign producer Ta Chen

Stainless Steel Pipe Co., Ltd. ("Ta Chen Taiwan"), and its wholly-owned U.S. subsidiary Ta

Chen International (CA) Corp. ("TCI") (collectively "Ta Chen"), participated in the underlying

review and appear before the court as Defendant-Intervenor.  Commerce issued its final

determination on November 13, 2006, upholding the constructed export price ("CEP") offset

granted in the *Preliminary Results*.  In finding that Ta Chen had cooperated in the review to the

best of its ability, Commerce also declined to apply available adverse facts in its antidumping

analysis.[1]  *See Issues and Decision Memorandum for the Administrative Review of Certain*

---

[1]  In the *Preliminary Results*, Commerce found that: (1) the evidence on the record did
not warrant a finding that it should disregard Ta Chen's financial statements, and thus
contradicted Plaintiff's allegation of undisclosed related parties; and, (2) the normal value
("NV") is established at a level of trade ("LOT") that is at a more advanced stage of distribution
than the LOT of the CEP transactions.  *Preliminary Results*, 71 Fed. Reg. at 39,664, 39,666.
Because Commerce was unable to quantify a LOT adjustment, it subsequently applied a CEP
offset to the NV-CEP comparisons in accordance with 19 U.S.C. § 1677b(a)(7)(B).

*Stainless Steel Butt-Weld Pipe Fittings From Taiwan; Final Results of Antidumping Duty*

*Administrative Review* (Dep't Commerce Nov. 13, 2006) ("*Decision Memorandum*"), Pub. R.

Doc. ("P.R. Doc.") 72 at 6, 8.  The court finds that substantial evidence supports Commerce's

negative affiliation findings, use of Ta Chen's financial statements, and award of a CEP offset.

## I.  Procedural History

In 1993, Commerce issued an antidumping order on certain stainless steel butt-weld pipe

fittings from Taiwan.  *See Amended Final Determination and Antidumping Duty Order: Certain*

*Welded Stainless Steel Butt-Weld Pipe and Tube Fittings from Taiwan*, 58 Fed. Reg. 33,250

(Dep't Commerce June 16, 1993) ("*AD Order*").  Subsequent to Ta Chen's request in June 2005,

Commerce initiated an administrative review for the period of June 1, 2004 through May 31,

2005.  *Preliminary Results*, 71 Fed. Reg. at 39,663; *see* 19 U.S.C. § 1675(a).

In response to Commerce's antidumping questionnaire of August 1, 2005, Ta Chen

reported that it was affiliated with twelve companies.  *See* Confidential R. Doc. ("C.R. Doc.") 1,

Ex. 4 & 4A; *Preliminary Results*, 71 Fed. Reg. at 39,664.  Plaintiffs, however, identified and

alleged that Ta Chen was affiliated with thirty-seven additional companies.  *See* 19 U.S.C.

§§ 1677(33), 1677a(b) & 1677a(d)(1); Memorandum from Dep't of Commerce, *Stainless Steel*

*Butt-Weld Pipe Fittings from Taiwan: Petitioners' Allegations Regarding Ta Chen Stainless*

*Pipe Co., Ltd. And Ta Chen International Corporation Affiliations* (Nov. 13, 2006) ("*Allegations*

*Memorandum*"), C.R. Doc. 32 at 2-3.  Of the thirty-seven alleged Ta Chen affiliates named in the

*Allegations Memorandum*, Plaintiffs re-identified thirty companies from a previous

administrative review in which Commerce already had made negative affiliation determinations

for all alleged affiliates.  *See Allegations Memorandum*, at 2; Memorandum from Dep't of

Commerce, *Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Petitioners' Allegations*

*Regarding Ta Chen Affiliations* (June 30, 2005) ("*Affiliations Memorandum*"), C.R. Doc. 32.

Commerce found that Plaintiffs had "provided no new compelling evidence" that the thirty

companies from the previous review were affiliated with Ta Chen, thereby rendering an

affiliation analysis unnecessary.  *Allegations Memorandum*, at 2.  For the seven newly identified

companies, Commerce found that they were not involved with the subject merchandise and

therefore not affiliated with Ta Chen for purposes of evaluating dumping margins.  *Id*. at 3-5.

Ta Chen also provided Commerce with its consolidated financial statements, as well as

the financial statements and annual reports of its subsidiary, TCI.  P.R. Doc. 7 at A-18.  Ta

Chen's 2004 consolidated financial statements, prepared in accordance with the generally

accepted accounting principles ("GAAP") of the Republic of China, contained financial

information from each of Ta Chen Taiwan's subsidiaries, including TCI, and identified ten

related parties.  C.R. Doc. 17 at Ex. A & B; P.R. Doc. 7 at Ex. 11 & 13.  TCI's 2003 financial

statements, prepared in accordance with U.S. GAAP, identified three related parties.  C.R. Doc. 1

at Ex. 12.

Plaintiffs challenged the accuracy of Ta Chen's submissions, claiming that TCI violated

U.S. GAAP by failing to disclose all of its related parties and significant related-party

transactions in its financial statements, and that by extension, Ta Chen's consolidated financial

statements were an inaccurate and unreliable benchmark.  Pl. Br. 8.  Commerce ultimately found

that TCI did not have to disclose as "related parties" the companies that Plaintiffs identified, and

consequently accepted TCI's financial statements as reliable benchmarks for Commerce's

dumping calculations. *Decision Memorandum*, at 6-7.

In the *Preliminary Results*, Commerce assigned an antidumping duty margin of 0.79% *ad*

*valorem* on certain stainless steel butt-weld pipe fittings. *See Preliminary Results*, 71 Fed. Reg.

at 39,666. Following comments by the parties, Commerce published its *Final Results* and

affirmed its assignment of a 0.79% *ad valorem* dumping margin. *See Final Results*, 71 Fed. Reg.

at 67,099. Commerce found that Ta Chen's home market sales were at a more advanced LOT

than its U.S. sales, based on Ta Chen's narrative descriptions depicting its selling functions in its

home and U.S. market, and thus granted Ta Chen a CEP offset to NV. *See* § 1677b(a)(7)(B);

*Decision Memorandum*, at 10-11; Ta Chen Section A Resp. (September 21, 2005), C.R. Doc. 1

at A-13 to -14. In support of its conclusion, Commerce stated that Ta Chen: (1) "[had] more

market customers who purchase in smaller volumes than TCI and require more individual

contacts"; (2) had a "larger sales staff devoted to home market sales"; (3) "assumes credit risk

and provides technical services only for its home market sales"; and (4) provided "just-in-time

delivery requiring a higher level of inventory maintenance only for home market sales." *Id*.

## II. Standard of Review

### A. Review of Determinations

This court must "sustain 'any determination, finding or conclusion found' by Commerce

unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance

with law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting

19 U.S.C. § 1516a(b)(1)(B)). Substantial evidence denotes "such relevant evidence that a

reasonable mind might accept as adequate to support the conclusion." *Consolo v. Fed. Mar.*

*Comm'n*, 383 U.S. 607, 619-20 (1966) (quotations & citation omitted).  Although "the possibility

of drawing two inconsistent conclusions from the evidence" may exist, that possibility, in itself

"does not prevent an administrative agency's findings from being supported by substantial

evidence." *Id*. at 620.

## B.  Review of Statutory Construction

In reviewing the lawfulness of an agency's construction of a statute, the court "must first

carefully investigate the matter to determine whether Congress's purpose and intent on the

question at issue is judicially ascertainable." *Timex V.I., Inc. v. United States*, 157 F.3d 879, 881

(Fed. Cir. 1998) (citing *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837,

842-43 & n.9 (1984)).  The court reaches the issue of *Chevron* deference only if it concludes,

after its investigation, that "Congress either had no intent on the matter, or that Congress's

purpose and intent regarding the matter is ultimately unclear."[2] *Id*.

The Federal Circuit has held that "statutory interpretations articulated by Commerce

during its antidumping proceedings are entitled to judicial deference under *Chevron*." *Pesquera*

*Mares Austales Ltda. v. United States*, 266 F.3d 1372, 1382 (Fed. Cir. 2001).  If *Chevron*

---

[2] *Chevron* review consists of a two-part inquiry.  *See NTN Bearing Corp. of Am. v. United States*, 368 F.3d 1369, 1375 (Fed. Cir. 2004).  First, the court determines "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  *Id*. (quoting *Chevron*, 467 U.S. at 842-43).  If, however, "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id*. "Where Congress has delegated authority to the agency to promulgate regulations elucidating statutory provisions, the resulting regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id*. (quotations & citation omitted).

deference is warranted, a court errs by substituting "its own construction of a statutory provision for a reasonable interpretation made by [Commerce]." *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1061 (Fed. Cir. 1992) (quoting *Chevron U.S.A., Inc.*, 467 U.S. at 844)).  Moreover, "deference may vary with circumstances," and thus, when granting *Chevron* deference, the court looks to "the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." *Crawfish Processors Alliance v. United States*, 477 F.3d 1375, 1380 (Fed. Cir. 2007) (quotations and citations omitted).

### III.  Discussion

### A.  Affiliated Party Analysis

In making a CEP and CEP offset determinations during an antidumping duty margin calculation, Commerce must take affiliated party transactions into account.  *See* §§ 1677(33), 1677a(b) & 1677a(d)(1).  Section 1677(33) defines "affiliated" or "affiliated persons" as those who are:

(A)     Members of a family, including brothers and sisters (whether by whole or half blood), spouse, ancestors, and lineal descendants;

(B)     Any officer or director of an organization and such organization;

(C)     Partners;

(D)     Employer and employee;

(E)     Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization;

(F)     Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person; and

(G)     Any person who controls any other person and such other person.

*Id*.  In addition, "a person shall be considered to control another person if the person is legally or

operationally in a position to exercise restraint or direction over the other person."  *Id*.  The

regulations further provide that

> in determining whether control over another person exists . . . , [Commerce] will
> consider the following factors, among others: corporate or family groupings;
> franchise or joint venture agreements; debt financing; and close supplier
> relationships. [Commerce] will not find that control exists on the basis of these
> factors unless the relationship has the potential to impact decisions concerning the
> production, pricing, or cost of the subject merchandise or foreign like product.

*Ta Chen Stainless Steel Pipe Co. v. United States*, Slip Op. 07-87, 2007 WL 1573920, at *15

(May 30, 2007) (not reported in F. Supp.) ("*Ta Chen II*") (quoting 19 C.F.R. § 351.102(b)).

## 1.  Subject Merchandise Requirement

Plaintiffs argue that Commerce must follow a "three step protocol" to examine a

respondent's affiliated parties, the first of which requires a respondent to "disclose all of its

affiliated parties at the outset of the investigation or review, regardless of their level of

involvement or not with the subject merchandise or foreign like product."  Pl. Br. 15.  However,

the Trade Act of 1930, as amended 19 U.S.C. §§ 1671-1677n (2000 & Supp. 2005) ("the Act"),

is silent with respect to the methods and procedures that Commerce must employ in obtaining

information about potential affiliates and therefore does not require Commerce to undertake the

"three step protocol" suggested by Plaintiffs.  Moreover, because the statute does not require

specific methods and procedures, the court must defer to Commerce's methods for obtaining

affiliated party information so long as they are consistent with a permissible construction of the

statute.  *See Chevron U.S.A., Inc.*, 467 U.S. at 843-44.

Furthermore, there is an inherent "subject merchandise" requirement throughout the antidumping statute and accompanying regulations that limits Commerce's affiliation determinations to only those companies that deal with, or have an effect on, the subject merchandise at issue in the antidumping investigation.  *See* §§ 1673-1673(i) & 1677(33); 19 C.F.R. § 351.102(b).  For example, when determining injury, Commerce examines whether there is a reasonable indication that a domestic industry is materially injured or threatened with material injury "by reason of imports of the *subject merchandise . . . .*"  § 1673b(a)(1) (emphasis added).[3]  Commerce must also limit its NV calculations to those transactions in which the foreign producer and its affiliates engaged in sales of the subject merchandise.  *See* § 1677b.  Indeed, the statute specifies the manner in which Commerce must calculate the "normal value of the *subject merchandise,*" and requires that Commerce address whether the "*subject merchandise* is being, or is likely to be, sold at less than fair value . . . ."  § 1677b(a) & (a)(1)(A).

Similarly, the regulations applicable to § 1677(33) also require that an affiliated party deal in the subject merchandise at issue.  Specifically, § 351.102(b) states that "[t]he Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the *subject merchandise or foreign like product.*"  § 351.102(b) (emphasis added).  This Court has found that § 351.102(b) is a

_____

[3]  Likewise, determinations of NV address whether "*subject merchandise* is being, or is likely to be, sold at less than fair value . . . ."  § 1677b(a) (emphasis added).

"reasonable [agency] interpretation" of section 1677(33)'s requirement that control exists only when a person considered to control another person be "legally or operationally in a position to exercise restraint or direction over the other person" whereby control over another exists only when "the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product."

*Ta Chen II*, Slip Op. 07-87, 2007 WL 1573920, at *16 (quoting *TIJID, Inc. v. United States*, 29 CIT ___, ___, 366 F. Supp. 2d 1286, 1298 (2005)).

As the language of the Act and the regulations restrict antidumping reviews to cases where the foreign producer or affiliated parties deal in the subject merchandise, Commerce need not make a finding of affiliation for each company that does not actually sell the subject merchandise.[4]

## 2. Commerce's Affiliation Analysis

Plaintiffs claim that Commerce erred by concluding that petitioners must first show an alleged affiliate's involvement with the subject merchandise prior to an affiliation determination. Pl. Br. 17-18. Based on the Act's subject merchandise requirement, the court finds that Commerce did not err in its application of § 1677(33).

During the administrative review, Commerce reviewed and made determinations regarding the affiliation status of the thirty-seven companies which Plaintiffs alleged were Ta Chen affiliates. *See Allegations Memorandum*, at 2-3; *Affiliations Memorandum*, C.R. Doc. 32. Commerce found that the seven companies newly identified by Plaintiffs did not meet the criteria

---

[4] Logic dictates that Commerce need only include those affiliates who deal in the subject merchandise in their antidumping determination, as a company's lack of involvement in the production of the subject merchandise inherently precludes them from harming the domestic industry.

of an affiliated party as set forth in § 1677(33), and gave the following reasons for each finding

of non-affiliation.  First, South Star Real Estate and Nirosteel, LLC, which allegedly shared a

corporate officer with AMS North Carolina, are not affiliated with Ta Chen because AMS North

Carolina was not a Ta Chen affiliate.  Second, Ta Chen Enterprises is not an affiliate because

familial ties between the management of the two companies are "unclear," and because there is

no evidence that Ta Chen Enterprise's involvement in real estate development affected the

pricing or cost of either the subject merchandise or foreign like product.  Third, G.M.T.S.

International Co., Ltd. had no involvement with the subject merchandise because the company

had been suspended since 1983.  Fourth, J.K. Industries WH., Inc. did not share an officer with

TCI and therefore was not affiliated with Ta Chen.  Fifth, QDII and QFII were not in fact

companies, but rather classes of investors under Taiwanese law entitled to invest directly in

Taiwanese securities.  As these two classes hold less than five percent of Ta Chen's shares, they

are not affiliates under the statute.  *See* § 1677(33)(E); *Allegations Memorandum*, at 5.

Instead of reviewing the affiliation status of the remaining thirty companies, Commerce

incorporated its previous conclusions by reference because Plaintiffs failed to provide new

evidence that would require Commerce to change its previous determination.  Specifically,

Commerce found no affiliation because: (1) certain companies were inactive,[5] defunct,[6]

---

[5]  Stainless Express, Inc., Stainless Express Prods., Inc., and South Coast Stainless, Inc.

[6]  SouthStar Steel Corp.

dissolved,[7] or suspended[8]; (2) Ta Chen's interest was divested before the period of review;[9]

(3) there was a lack of familial relationship as specified in § 1677(33)(A);[10] (4) there was lack of

any relationship specified under § 1677(33);[11] and (5) Ta Chen's relationship with the companies

lacked the potential to affect the production pricing, or cost of the subject merchandise.[12]

*Affiliations Memorandum*, at 3-10, 12-16. Because substantial evidence supports the conclusion

that the thirty-seven companies named by Plaintiffs are not affiliated with Ta Chen, the court

must defer to Commerce's determination.

## B. TCI's Financial Statements

### 1. U.S. GAAP Related Party Disclosures

Plaintiffs contend that Commerce incorrectly concluded that Ta Chen's consolidated

financial statements were reliable benchmarks for use in the antidumping analysis. Furthermore,

Plaintiffs argue that U.S. GAAP requires two disclosures: (a) all significant related-party

---

[7]  Billion Stainless, Inc., Estrela Int'l, Inc., and Estrela Int'l Corp.

[8]  Estrela Int'l Co., Ltd.

[9]  AMS Specialty Steel, Inc., AMS Specialty Steel, LLC, and AMS Steel Corp.

[10]  DNC Metal, Inc.

[11]  Becmen Special Steels, Inc., Becmen LLC, Becmen Corporation, and Becmen Trading Int'l, Inc.

[12]  Emerdex Stainless Flat Roll Products, Inc., Emerdex Stainless Steel Inc., Emerdex Group, Inc., Emerdex-Shutters, Dragon Stainless, Inc., Millenium Stainless Inc., DNC Metal, Inc., PFP Taiwan Co., Stainless Express, Inc., Stainless Express Products, Inc., Estrela Int'l Inc., Estrela Int'l Corp., Estrela International Co., Ltd., LHPJ Int'l Inc., LPJR Investment, LLC, KSI Steel, Inc., K. Sabert, Inc., Sabert Investments Inc., and one other company whose identity is confidential.

transactions, and (b) all related parties, regardless of whether there have been any related-party transactions during the reporting period.  Pl. Br. 22-23.  Based on this interpretation of the disclosure requirements, Plaintiffs argue that Commerce "wrongly took license and created new accounting standards for related-party disclosures" by focusing on "whether the domestic industry demonstrated 'an indisputable control relationship' that 'clearly could have resulted in significantly different financial results of the companies.'"  Pl. Br. 23.  The court disagrees.

Pursuant to the Statement of Financial Accounting Standards explaining U.S. GAAP for related party disclosures (SFAS No. 57), "financial statements shall include disclosure of material related party transactions."  *See Related Party Disclosures, Statement of Financial Accounting Standards No. 57* ¶ 2 (Fin. Accounting Standards Bd. 2006), P.R. Doc. 20 Ex. 1. SFAS No. 57 defines "related parties" as those with which "the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other"; those which "significantly influence the management or operating policies of the transacting parties"; and those who have "an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own interests."  *Id*. app. B(f) (emphasis added).  SFAS No. 57 also states that:

> If the reporting enterprise and one or more other enterprises are under common ownership or management *control and the existence of that control* could result in operating results or financial position of the reporting enterprise *significantly different* from those that would have been obtained if the enterprise were autonomous, the nature of the *control relationship* shall be disclosed even though there are no transactions between the enterprises.

*Id*. ¶ 4 (emphasis added).

## 2. Commerce's Related Party Determination

In its November 13, 2006 Memorandum on Ta Chen's related parties, Commerce analyzed twelve parties which Plaintiffs had identified as alleged related parties. *See* Memorandum from Dep't of Commerce, *Stainless Steel Butt-Weld Pipe Fittings from Taiwan: Petitioners' Allegations Regarding Ta Chen Stainless Pipe Co., Ltd., and Ta Chen International (CA) Corporation Related Parties* (Nov. 13, 2006) ("*Related Parties Memorandum*"), P.R. Doc. 69. Commerce evaluated two companies in a narrative format and found that Plaintiffs had not demonstrated that "a *control relationship* existed between the companies that could have resulted in *significantly different* financial results during the [period of review]." *Id*. at 3 (emphasis added). Of the remaining ten companies, Commerce concluded that none satisfied the criteria of "related parties" under U.S. GAAP. *Id*. at 5-7. For seven companies in particular, Commerce noted that "[a]n indisputable *control relationship* has not been demonstrated to exist such that the existence of that control clearly could have resulted in *significantly different* financial results of the companies." *Id*. at 4-7 (emphasis added). In using phrases like "significantly different" and "control relationship," Commerce's memorandum closely parallels the language in SFAS No. 57, and as such, the court finds that Commerce did not create "unauthorized new standards" as Plaintiffs allege, but rather, that Commerce applied U.S. GAAP in its analysis of Ta Chen's related party disclosures. *Id*.; *see* SFAS No. 57 ¶¶ 2, 4.[13]

---

[13] Notwithstanding Commerce's application of U.S. GAAP in this case, the court has held that because "the antidumping laws, along with agency implementing regulations, alone establish the criteria for determining whether parties are affiliated, their resemblance to, or possible overlap with, U.S. or foreign GAAP standards are not of conclusive moment." *Ta Chen II*, Slip Op. 07-87, 2007 WL 1573920, at *14. Therefore, even if the court had concluded that Commerce diverged somewhat from the language in SFAS No. 57, such a finding would not

Plaintiffs also question Commerce's reliance upon the auditor's opinion, which concluded that TCI's financial statements properly disclosed all related parties and all significant related party transactions. Pl. Br. 28. In this case, independent auditors reviewed TCI's 2004 financial statements and issued an "unqualified opinion" that the financial statements "present fairly in all material respects the financial position of TCI as of December 31, 2004, . . . in conformity with accounting principles generally accepted by the United States of America."[14] *Decision Memorandum*, at 6. Citing paragraphs one, four, and twenty-one, Commerce concluded that "inherent in SFAS [No.] 57 is a judgment element and the company does not need to disclose every relationship." *Id*. at 7. Commerce also explained that:

> in the context of assessing disclosures of affiliated parties in a financial statement prepared in accordance with financial accounting standards, a judgement as to whether or not a relationship should have been disclosed does not depend upon a factual finding, but *rather opinions as to whether the auditors' decisions about disclosure were reasonable*. This factor alone requires that there be *very strong record evidence* for [Commerce] to overturn the independent auditor's opinion.

*Id*. (emphasis added). Because the record did not provide "compelling evidence" to "reject the independent auditors' opinion and discredit the financial statements," Commerce properly relied on TCI's financial statements. *Id*. at 6.

-----

automatically render Commerce's reliance on the financial statements erroneous. Rather, the court would weigh the record evidence and determine whether substantial evidence supported Commerce's reliance. *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

[14] Plaintiffs concede that "an auditor's responsibility is limited to issuing an opinion on a company's financial statements." Pl. Br. 27. Here, the auditor did not exceed his competency, and opined solely on the accuracy of TCI's financial statements. It is therefore futile for Plaintiffs to claim that Commerce may not rely on the very statements which an independent review found to be accurate representations of the company's finances.

This Court "has consistently upheld Commerce's reliance on a firm's expenses as recorded in the firm's financial statements, as long as those statements were prepared in accordance with the home country's GAAP and do not significantly distort the firm's actual costs."[15] *Ta Chen II*, Slip Op. 07-87, 2007 WL 1573920, at *15 (citing *FAG U.K. Ltd. v. United States*, 20 CIT 1277, 1290, 945 F. Supp. 260, 271 (1996)).  Moreover, "Commerce is generally given the benefit of wide latitude in the verification procedure it chooses to implement." *Id.* (quotations & citation omitted).  Accordingly, based on the record evidence, the court defers to Commerce's determination and holds that TCI's financial statements were accurate and reliable benchmarks for use in the antidumping analysis.

## C.  The Constructed Export Price Offset

### 1.  Legal Framework

Commerce calculates an antidumping duty rate by comparing the NV, *i.e.*, home market price, of the subject merchandise in the foreign market and the "export price" ("EP") or CEP. *See Mittal Steel Galled S.A. v. United States*, 31 CIT __, __, 502 F. Supp. 2d 1295, 1297 (2007); *Fla. Citrus Mut. v. United States*, 31 CIT __, __, 515 F. Supp. 2d 1324, 1327 (2007).  To calculate NV Commerce uses "the exporting market price (*i.e.*, the market where the goods are produced), an appropriate third country market price, or the cost of production of the goods." *Ta*

---

[15]  This Court has also found that Commerce's "decision to rely upon audited, home-country GAAP-compliant financial statements in gathering cost-of-production data [is] in accordance with the law and agency practice." *Ta Chen II*, Slip Op. 07-87, 2007 WL 1573920, at *15 n.16 (citing 19 U.S.C. § 1677b(f)(1)(A) (stating that Commerce may use a records if they are kept in accordance with the firm's home country GAAP and reasonably reflect production and sale costs.); *Id*. n.17 (citing *ITA Final Determination of Sales at Less Than Fair Value: Canned Pineapple Fruit From Thailand*, 60 Fed. Reg. 29,553, 29,559 (Dep't Commerce, June 5, 1995)).

*Chen Stainless Steel Pipe, Ltd. v. United States*, 28 CIT 627, 630, 342 F. Supp. 2d 1191, 1194

(2004) ("*Ta Chen I*").  Commerce establishes a NV "to the extent practicable, at the same level

of trade as the [EP] or [CEP]."  19 U.S.C. § 1677b(a)(1)(B)(i).

LOT are defined as "marketing stages (or their equivalent)," 19 C.F.R. § 351.412(c)(2),

whereas EP or CEP reflect "the price at which the subject merchandise is first sold, or agreed to

be sold, in the United States . . . to a purchaser not affiliated with the producer or exporter . . ."

19 U.S.C. § 1677a(b); *see Fla. Citrus Mut*., 31 CIT at __, 515 F. Supp. 2d at 1327.  Commerce

may make a LOT adjustment if it determines that "sales in the two markets were not made at the

same [LOT], and that the difference has an effect on the comparability of the prices."

§ 351.412(a); *see*  § 1677b(a)(7)(A).

Where Commerce calculates NV at a different LOT from the LOT of EP or the CEP

(whichever applies), it may adjust NV to compensate for the difference.  *See* § 351.412(b); *see

also Mittal Steel USA, Inc. v. United States*, Slip Op. 07-117, 2007 WL 2701369, at *7 n.12

(2007) (stating that the level of trade adjustment is designed to ensure the NV and U.S. price are

being compared at the same marketing stage.).  Furthermore, Commerce makes a LOT

adjustment to the NV if the difference in LOTs "involves the performance of different selling

activities" and "is demonstrated to affect price comparability, based on a pattern of consistent

price differences between sales at different levels of trade in the country in which normal value is

determined."  § 1677b(a)(7)(A); *Mittal Steel USA, Inc.*, Slip Op. 07-117, 2007 WL 2701369,

at *8.

When Commerce compares the NV to the CEP, however, it must also adjust the CEP

figure "in accordance with the statutory provisions set out in § 19 U.S.C. 1677a(c)-(d) to achieve

a fair 'apples-to-apples' comparison between U.S. price and foreign market value 'at a similar

point in the chain of commerce.'" *Fla. Citrus Mut.*, 31 CIT at __, 515 F. Supp. 2d at 1328 (citing

*Torrington Co. v. United States*, 68 F.3d 1347, 1352 (Fed. Cir. 1995)).  Where the NV is at a

more advanced LOT than the CEP, and the available data do not permit a determination on

whether the difference affects price comparability, Commerce may also make a CEP offset using

indirect selling expenses in the home market.  *See* 19 C.F.R. § 351.412(f).  In such cases,

> normal value shall be reduced by the amount of indirect selling expenses incurred
> in the country in which normal value is determined on sales of the foreign like
> product but not more than the amount of such expenses for which a deduction is
> made under section 1766a(d)(1)(D) of this title.

§ 1677b(a)(7)(B).

### 2. Ta Chen's Selling Activities

In its *Decision Memorandum*, Commerce found that "the LOT of home market sales is

different from the LOT for Ta Chen's CEP sales, and that on balance the LOT is more advanced

in the home market."[16]  *Decision Memorandum*, at 10.  Because Commerce was also unable to

---

[16]  Ta Chen's reported selling functions in the home market include: "meeting and
entertaining customers, maintaining inventory and providing just-in-time delivery, assuming
credit risk of nonpayment, addressing customer complaints, scheduling customer pickups of
merchandise at the factory in their own trucks, providing technical assistance, and research and
development." *Decision Memorandum*, at 10.  TCI's selling activities include "accepting orders,
scheduling production, and making arrangements for inland freight to the port, brokerage,
containerization and Taiwan customs clearance, including payment of harbor tax." *Id*.  Ta Chen
also characterized TCI as a "master distributor" which "handles all the selling functions for sales
to the first unaffiliated customer in the United States, including all communications with
customers, U.S. customs duties, U.S. brokerage, U.S. inland freight, U.S. warehousing, inventory
maintenance and assumption of risk of nonpayment." *Id*.

quantify the effect of the difference in LOT on prices, it ultimately decided to continue granting

Ta Chen a CEP offset.  *Id*.

Plaintiffs challenge Commerce's CEP analysis and argue that the underlying review

showed Ta Chen "did *not actually perform* activities related to addressing customer complaints

and providing assistance."  Pl. Br. 34 (emphasis in original).  Plaintiffs, however, misinterpret the

record evidence, as the very document cited states that: "[a]s to home market sales, Ta Chen

Taiwan technical services include . . . reviewing customer complaints as to fittings, including

testing of the particular fitting's performance characteristics."  Ta Chen Section B and C Resp.

(Sep. 26, 2005), P.R. Doc. at B27-B28.  In addition, Ta Chen Taiwan specified that "[its]

employees themselves perform these technical service functions.  No outside workers are used,"

and that it "does not do these technical services for the United States."  *Id*. at B-28.  Thus, the

record evidence supports Commerce's finding that the LOT of home market sales is more

advanced than the LOT of the CEP sales.

Alternatively, Plaintiffs claim that the CEP offset analysis must consider *all* selling

activities performed for unaffiliated U.S. customers up to the time of U.S. entry, and thus

Commerce failed to consider "Taiwanese insurance, Taiwanese inventory carrying costs,

Taiwanese brokerage, marine insurance, Taiwanese banking expenses and packaging."  Pl.

Br. 33; *see* § 351.412(c)(1)(ii).  Commerce however, explicitly states that it "examined the

selling activities reported for each channel of distribution and organized the reported selling

activities into the following four selling functions: sales process and marketing support, freight

and delivery, inventory maintenance and warehousing, and warranty and technical services."

*Preliminary Results*, 71 Fed. Reg. at 39,666.  Therefore, even if Commerce did not specifically

mention each and every selling function it analyzed, the selling activities specifically detailed in

the *Decision Memorandum* correspond to one of the four categories enumerated in its July 2006

memorandum and indicate that Commerce did consider all major types of selling functions in its

CEP offset analysis.  *See supra* note 16.

Next, Plaintiffs claim that Commerce improperly compared the number of home market

customers and United States customers, and that Commerce "should have considered the selling

activities that were provided by Ta Chen Taiwan to the first unaffiliated U.S. Customer – not to

Ta Chen Taiwan's U.S. affiliate, TCI . . . ."  Pl. Br. 35.  Nevertheless, Plaintiff's own submission

cites to § 1677a(d), which requires that Commerce disregard certain U.S. selling expenses, such

as U.S. commissions, credit expenses, guarantees, warranties, and generally, all expenses

incurred in the U.S. by selling the subject merchandise, *i.e.*, TCI's selling activities.  *See*

§ 1677a(d)(1).  In calculating the LOT of the CEP, Commerce considers only the selling

activities reflected in the adjusted CEP.  Although the CEP generally represents the price at

which the subject goods are sold to the first unaffiliated purchaser, Commerce may, as it did

here, reduce the CEP in accordance with § 1677a(c)-(d) to ensure an "apples-to-apples

comparison."  *See Fla. Citrus Mut.*, 31 CIT at __, 515 F. Supp. 2d at 1328.  Section 1677a(d)(1)

requires Commerce to reduce the CEP by the amount of any of various expenses "incurred by or

for the account of the producer or exporter, *or the affiliated seller* in the United States, in selling

the subject merchandise."  *See* § 1677a(d)(1).  As a result, the adjusted CEP does not reflect

certain expenses and profit relating to sales to unaffiliated U.S. purchasers.  Therefore, contrary

to Plaintiffs' claim, the adjusted CEP cannot, and does not, include TCI's selling activities.

### IV.  Conclusion

For the foregoing reasons, the court holds that substantial evidence supports the final

results of Commerce's antidumping determination.  Accordingly, Plaintiff's motion for judgment

upon the agency record is **DENIED**.


Dated:    March 13, 2008                              /s/ Judith M. Barzilay
          New York, NY                                Judith M. Barzilay, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

ALLOY PIPING PRODUCTS, INC., *et al.*,   :

        Plaintiffs,   :

    v.   :

UNITED STATES,   :

        Defendant,   :

   and   :

TA CHEN STAINLESS STEEL PIPE   :
CO., LTD.,   :

        Defendant-Intervenor.   :

Before: Judith M. Barzilay, Judge
Court No. 06-00454

### JUDGMENT ORDER

Upon consideration of Plaintiffs' Rule 56.2 motion for judgment upon the agency record challenging Commerce's antidumping determination, Defendant United States' and Defendant-Intervenor's respective responses thereto, and all other papers filed in this civil action, it is hereby:

ORDERED that Plaintiff's motion for judgment on the agency record is DENIED.

Dated: March 13, 2008
    New York, NY

                     /S/       Judith M. Barzilay
                                 Judge

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____

                                          Deputy Clerk